David **DEWEES** and Anne **Dewees,**
**Petitioners, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent, Appellee.**

**No. 87–1763.**

United States Court of Appeals,
First Circuit.

Heard Oct. 4, 1988.
Decided March 15, 1989.

Martin M. Ruken with whom Stuart D. Kenney, Vedder, Price, Kaufman & Kammholz, Kenneth C. Shepro and Altheimer & Gray, Chicago, Ill., were on brief, for petitioners.

Kenneth L. Greene, Tax Div., Dept. of Justice, with whom William S. Rose, Jr., Asst. Atty. Gen., Gary R. Allen and Richard Farber, Tax Div., Dept. of Justice, Washington, D.C., were on brief, for respondent.

* Of the Fifth Circuit, sitting by designation.

Before BOWNES and BREYER, Circuit Judges, and BROWN,* Senior Circuit Judge.

BREYER, Circuit Judge.

Taxpayers David and Anne Dewees appeal from a Tax Court decision that a 1978 loss they incurred while engaged in "straddle" trading on the London Metals Exchange was not an "ordinary loss" deductible from their income. *See* Internal Revenue Code, 26 U.S.C. § 165(c)(2) (1982); Deficit Reduction Act of 1984, Pub.L. No. 98–369, § 108, 98 Stat. 494, 630–631 (1984) (a provision enacted specifically to govern deductions of losses from straddle transactions). The Tax Court held that their loss was not deductible because the transactions were shams, without economic substance, *see Gregory v. Helvering*, 293 U.S. 465, 469–70, 55 S.Ct. 266, 267–68, 79 L.Ed. 596 (1935), or, alternatively, because the transactions were not "entered into for profit" within the meaning of § 108. Consequently, the Deweeses cannot deduct the loss from their ordinary income, though they can use it in calculating the net losses or gains they incurred from the whole series of transactions, under § 108(c). *Glass v. Commissioner*, 87 T.C. 1087 (1986).

The Deweeses claim that the Tax Court is wrong, that their transactions have economic substance and were entered into "for profit." The issue they raise is important because their transactions typify those at issue in about 1,100 other cases consolidated by the Tax Court (the "London options cases"), involving potential tax revenues of more than $60 million. We have devoted considerable efforts to understanding, in detail, the typical transactions before us. We have concluded that these transaction are not "for profit," and that the Tax Code forbids the deduction that the Deweeses seek. And, we have decided to explain our reasons through the use of a hypothetical example (created with the help of the parties) that both captures the essence of the actual transactions and permits us, by varying certain assumptions, to deal more

easily with the legal arguments the parties raise.

## I.

### Background

To understand the trading strategy the Deweeses used, one must keep several background facts in mind. First, dealers on the London Metal Exchange typically sell silver in 10,000 ounce "lots." They sell silver for future delivery up to 7 months away. Thus, in January one can buy current, February, March, April, May, June, July or August silver. The price of a later lot will normally exceed the price of an earlier lot by a small amount of money which reflects the interest on the money that is "tied up" in the silver (plus storage and insurance costs and other minor factors). For example, if March silver sells for 250 pence per ounce, April silver will then likely sell for 255 pence per ounce. This price difference is called the "contango" (a concept that plays an important role in this case).

Second, a buyer or seller of silver for future delivery often does not really expect to deliver, or to receive, the silver in question. Rather, as the time for delivery approaches, he will buy or sell an offsetting amount of silver. Doing so is called "liquidating" or "closing out" a "position."

One can also buy or sell options. When one buys an option on future silver, one does not have to exercise it; one merely has a *right* to exercise it. Thus, assume that it now is January, January silver is selling for 250 pence per ounce, and July silver is selling for 280 pence per ounce. Assume that Jane wants an option to buy July silver at a price of 280 (an "option to buy" is, of course, an option to buy at a certain price, which price is called the "strike price").

Even though the strike price is 280 and July silver now sells for 280, Jane will have to pay something for her option. That is because she wants a one-way bet. If the July price goes up, she will exercise her right to buy, and make money; if the July price goes down, she will throw the option away. Someone may be willing to make this "bet" with her, but only at a price. The person who sells her this bet is called the "grantor" of an option, and the price she pays him is called the "premium." The grantor is betting that the price of July silver will decrease, or not increase by much. If he is right, it will not be to Jane's advantage to exercise the option, and he will have gained the premium. However, if July silver goes up, he will have to buy silver at a higher price, to offset his obligation to deliver silver to Jane at 280. If the difference between that higher price, and the strike price of 280, comes to more than the premium Jane paid him, then he loses money overall. The premium paid for an option depends both on whether the strike price favors the buyer or the grantor of the option, and on the "time value" of the option, *i.e.*, how long the option remains open and the grantor remains at risk.

So far we have described Jane's purchase of a "call" option, an option to buy. Jane might also purchase a "put" option, an option to sell silver, for example, next July at 280. In buying a "put" option, Jane is hoping the price of July silver will fall, while the grantor of the option is hoping the price will stay fairly constant or rise, so that Jane does not exercise her option and the grantor can simply keep its purchase price.

Third, the London Metal Exchange is a principal-to-principal market, in which broker/dealers buy and sell directly from and to clients. This differs from a clearinghouse market like the American stock exchanges, in which brokers arrange trades between their clients and third parties. The London broker/dealers have greater freedom than American stockbrokers in setting the terms of trades. They can make trades both inside and outside of formal market sessions, and they are free to set strike prices and premiums through private negotiation. The result is that one cannot easily determine (by, say, looking to public exchange prices) the precise terms that a "free market" would set for a particular option or futures contract. However, brokers on the Exchange have a practice of

"laying off" their trades with each client, each day, by entering into offsetting transactions with other buyers or sellers. This way, the brokers are exposed to no net market risk, and do not hold interests adverse to their clients'. Laying off trades is possible only if brokers' discretionary trades with their clients are at prices that conform to the market, so this practice tends to standardize prices on any given trading day.

Fourth, the Internal Revenue Service, in 1974, issued a ruling that the closing out of either a put or call option that one has *bought* produces a *capital* gain or loss, but the closing out of an option that one has *granted* produces an *ordinary* gain or loss. Private Letter Ruling 7404080200A (April 8, 1974) (the "Zinn Ruling," issued to the Chicago Board Options Exchange). This treatment made legal sense in light of the wording of the relevant statutory provisions, *see* 26 U.S.C. § 1234, but it produced an economic asymmetry that made it possible to create ordinary losses for tax purposes and offset them with capital gains. *See Glass*, 87 T.C. at 1153–55.

Fifth, the Internal Revenue Code treats offsetting sales and purchases that take place within a single month as "wash sales," and disregards them. 26 U.S.C. § 1091(a). However, the transactions in this case involve lots of silver for sale in different months, so they are not "wash sales," even if they seem to cancel each other out.

## II.

### *The Transactions*

On the basis of the Tax Court's descriptions, the parties' briefs, and oral argument, we believe we can view the essence of the trading strategy used by the Deweeses as a series of transactions having three parts, an *options straddle*, a *futures straddle*, and a *futures switch.*. A taxpayer buys and sells both "put" and "call" options on future silver (the "options straddle"). He waits a few weeks for prices to change, and then liquidates his positions, creating ordinary losses and short-term capital gains. The taxpayer uses the ordinary losses to offset ordinary income from other sources. He then buys and sells silver for delivery several months later (the "futures straddle"). He waits a month or so for prices to change. He then liquidates whichever is the loss leg of the futures straddle, to create a short-term capital loss to offset his short-term capital gain. Finally, the taxpayer "locks in" his gain leg, by making an offsetting futures purchase or sale (the "futures switch"). The next year he liquidates all his futures positions, realizing a capital gain. This gain may be a long-term capital gain, *see* 26 U.S.C. § 1222(3), which was taxed at a low rate, or a short-term capital gain. If it was the latter, the taxpayer can use another futures straddle to "roll over" the gain into the next year, again deferring tax liability, and hoping to convert it into a long-term capital gain.

We shall now describe what we have come to regard as the "paradigm" transaction in greater detail, through an example. Although the example is simplified, we believe it embodies the essence of the actual transactions into which the Deweeses (and many other taxpayers) entered. The example uses imaginary dates and numbers, and makes the important simplifying assumption that the contango between silver prices for successive months remains constant. This assumption usually does not hold true in the actual market; contangos can vary significantly even from day to day. We later will consider what happens if this assumption does not hold true.

The example is intended to show how an investor who seeks to create an ordinary loss in one year, and an offsetting, possibly long-term, capital gain in the next year, might do so with minimal risk, regardless of whether silver prices rise or fall, assuming only that the contango remains constant and that silver prices move in either direction.

### A. *The Options Straddle*

In this first step of the overall trading strategy, Jane uses an options straddle to create an ordinary loss with an offsetting capital gain.

Assume that it is January 1 (Year One). Silver prices are as follows:

| Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. |
|------|------|------|------|-----|------|------|------|
| 250  | 255  | 260  | 265  | 270 | 275  | 280  | 285  |

First, Jane enters into a "call option straddle." She will *buy* call options on 5 lots of May silver with a strike price of 270, (*i.e.*, each option gives her the right to buy 10,000 ounces of May silver at a price of 270 pence per ounce). The grantor charges her, say, £ 8,000 for these options. Jane will, simultaneously, *sell* (grant) call options on 5 lots of July silver with a strike price of 280. She charges the buyer, say, £ 12,000 for the options. (The premium is higher because the options are open longer, so the grantor is exposed to more risk.)

Jane will also, at about the same time, enter into a "put option straddle." Assuming that the call option straddle and the put option straddle are executed within a few days, the prices involved will be similar. (For simplicity, we assume the prices are identical in this example.) To start the put option straddle, Jane will *buy* put options on 5 lots of May silver with a strike price of 270, (*i.e.*, each option gives her the right to sell 10,000 ounces of May silver at a price of 270 pence per ounce). The grantor will charge her £ 8,000 for these options. Jane will simultaneously *sell* put options on 5 lots of July silver with a strike price of 280. She charges the buyer £ 12,000 for the options.

For the purposes of this example, we have assumed that all the options Jane buys and sells have a strike price "on the money," that is, equal to the market price for that month's future silver. It is also possible to buy and sell options whose strike price differs from the market price; the premium paid for such options would be higher or lower, depending on whether the strike price favors the buyer or the grantor. "On the money" options are simpler, because their premiums depend only on their time value; we have assumed that the premiums cost £ 2,000 for every month the option is to remain open.

At this point, we must consider two possibilities; silver prices may either rise or fall, and Jane's strategy will vary accordingly.

1. Assume that by March silver prices have gone up by 50 pence per ounce.

Prices now (in March) look like this:

|     | Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. |
|-----|------|------|------|------|-----|------|------|------|
| old | 250  | 255  | 260  | 265  | 270 | 275  | 280  | 285  |
| new |      |      | 310  | 315  | 320 | 325  | 330  | 335  |

Jane now sells the May call options that she bought. They have become more valuable by about 50 pence per ounce, because the premium she can get for them will rise along with the silver price. (For simplicity, we assume that the premium varies directly with the price fluctuations of silver; in reality the relation between premium price and commodity price is somewhat more complex.) She owned options on 5 lots (50,000 ounces), so she will be able to sell her options at about £ 25,000 more than the £ 8,000 premium she originally paid. She has made a gain of £ 25,000, which counts as a capital gain under the IRS rulings. *See Glass*, 87 T.C. at 1153.

Jane now must buy call options on 5 lots of July silver at a strike price of 280, to "close out" the other "leg" of her "straddle," so as to liquidate her position as grantor of the 5 call options on July silver. Since the price of silver has gone up 50 pence per ounce, she will have to pay about £ 25,000 more for these options than the premium she originally received. So, she has a loss of £ 25,000, an ordinary loss under IRS rules.

Since the price went up quite a lot, the put options are nearly worthless in March. No one will pay much to buy her options to sell May silver at so low a price; and Jane can cancel out the July put options she sold, for a low premium. So, her £ 25,000 gain from the bought call options is reduced by most of the £ 12,000 premium she paid for her put options; she has a net short-term capital gain of, say, £ 15,000. Also, it costs only, say, a £ 2000 premium to buy put options on July silver with a strike price of 280 (now far below the current market price), to cancel out the put options Jane sold for £ 12,000. Her £ 25,000 loss on the sold call options is mitigated by a £ 10,000 gain on her sold put options, for a net ordinary loss of £ 15,000.

Jane is left with approximately £15,000 of ordinary loss and £15,000 of short-term capital gain.

2. Assume that by March silver prices have fallen by 50 pence per ounce.

Prices now look like this:

|     | Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. |
|-----|------|------|------|------|-----|------|------|------|
| old | 250  | 255  | 260  | 265  | 270 | 275  | 280  | 285  |
| new |      |      | 210  | 215  | 220 | 225  | 230  | 235  |

Jane now sells the May put options that she bought. They have become more valuable by about 50 pence per ounce, so she will be able to sell them, to make a capital gain of about £25,000.

Jane now must buy put options on 5 lots of July silver at a strike price of 280, to close out the other leg of her straddle. Since the price of silver has gone down 50 pence per ounce, she will have to pay about £25,000 more for these options than she originally received, so she incurs an ordinary loss of £25,000.

Since the price went down quite a lot, the call options are nearly worthless. No one will pay much for the right to buy May silver at so high a price; and Jane can cancel out the July call options she sold by buying offsetting options at a low premium. So, her net gain and loss from the put options will both be reduced by about the same amount, and again, Jane will be left with approximately £15,000 of ordinary loss and £15,000 of short-term capital gain. She can use the £15,000 ordinary loss to offset £15,000 of her ordinary income from some other source (though at this point that will not do her much good, for she still has £15,000 of short-term capital gain that the government would tax at the same rate as ordinary income).

## B. *The Futures Straddle*

The next step, a futures straddle, enables Jane to generate a capital loss in Year One that will offset her £15,000 short-term capital gain. Assume that it is now October of Year One. The market has returned to January prices:

| Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May |
|------|------|------|------|------|------|------|-----|
| 250  | 255  | 260  | 265  | 270  | 275  | 280  | 285 |

Jane now buys 5 lots of April silver at a price of 280 pence per ounce. She also sells 5 lots of May silver at a price of 285 pence per ounce. She then waits to see what happens to the price of silver.

Again, we must consider two possibilities; silver prices may either rise or fall and Jane's strategy will vary accordingly.

1. Assume that, by November, silver prices have risen 30 pence per ounce.

Jane is now looking at the following prices:

|     | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June |
|-----|------|------|------|------|------|------|------|-----|------|
| old | 250  | 255  | 260  | 265  | 270  | 275  | 280  | 285 | 290  |
| new |      | 285  | 290  | 295  | 300  | 305  | 310  | 315 | 320  |

Jane now (in November) realizes that her contract to sell May silver has become far less valuable. The 5 lots she sold at 285 are worth much more than what she sold them for. She "closes out" this transaction by buying 5 lots of May silver (which she can use to fulfill her side of the sale bargain). She must pay 315 pence per ounce. She therefore loses 30 pence per ounce on the transaction. She has lost £15,000. This £15,000 short-term capital loss will offset the short-term capital gain she created through her options straddle.

2. Assume that, by November, silver prices have fallen 30 pence per ounce.

Jane is now looking at the following prices:

|     | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June |
|-----|------|------|------|------|------|------|------|-----|------|
| old | 250  | 255  | 260  | 265  | 270  | 275  | 280  | 285 | 290  |
| new |      | 225  | 230  | 235  | 240  | 245  | 250  | 255 | 260  |

Jane realizes that her contract to buy April silver at 280 has become far less valuable. She sells that contract. She can obtain only 250 for it. She has thus lost 30 pence per ounce, or £15,000. She has a short-term capital loss of £15,000, which she can use to offset the £15,000 short-term capital gain arising out of her option straddle.

Either way, Jane has a short-term capital loss. She has disposed of the "loss leg" of her straddle, and she has kept the leg with the corresponding gain.

## C. *Futures Switch*

Jane "locks in" the gain on the profitable leg of her futures straddle in November, by buying or selling an offsetting new fu-

tures contract. In case "1" above, where the price of silver went up, Jane disposed of her May "sale" leg at a loss of £ 15,000. She kept the 5 lots of April silver that she had bought at 280. As we mentioned, by November that silver was worth 310 per ounce. She protects that gain by immediately selling 5 lots of June silver at the present (November) price of 320 pence per ounce. Now, whatever happens, she is protected. For every penny the price of silver goes up, her contract to sell becomes less valuable but her contract to buy becomes more valuable, by just one penny. For every penny the price of silver goes down, her contract to buy becomes less valuable, but her contract to sell becomes more valuable, by just one penny.

If, for example, the price of silver rises by another 50 pence per ounce, (so that June silver sells for 370 pence), she will have to pay 370 pence per ounce to satisfy her contracts to sell 5 lots of June silver for 320; but, her contracts to buy 5 lots of April silver at a price of 280 will be correspondingly more valuable, because April silver will now sell for 360. If the price of silver falls by 50 pence per ounce, she will have to buy April silver at 280, when its current price is only 260; but her contracts to sell June silver at 320 pence per ounce will be correspondingly more valuable, because June silver will sell at 270. What Jane has lost on the swings, she has gained on the roundabouts; her £ 15,000 profit is safe.

In case "2" above, when silver prices fell, Jane kept the "sale" leg of her straddle. She owns contracts to sell 5 lots of silver in May at a price of 285. Jane protects her gain by buying 5 lots of June silver at its present (November) price of 260. For every penny the price of silver goes up or down, her contracts vary accordingly. If, for example, the price of silver falls by another 50 pence per ounce, (so that June silver sells for 210 pence), she will receive only 210 pence per ounce when she sells the 5 lots of June silver she just purchased at a price of 260; but, her contracts to sell 5 lots of May silver will be correspondingly more valuable, for May silver will now sell for 205. If the price of silver rises by 50

pence per ounce, she will have to sell May silver at 285, when its current price is 305; but her contracts to buy June silver at 260 pence per ounce will be correspondingly more valuable, for June silver will sell at 310. What Jane has lost on the swings, she has gained on the roundabouts; her £ 15,000 profit is safe.

Jane sells all her futures contracts, after holding the contracts to buy for more than 6 months. That is, in case "1" she waits until April, when she will have held her contracts to buy 5 lots of April silver from October to April; in case "2" she waits until May, when she will have held her contract to buy June silver from November to May. The reason for waiting 6 months is that a capital gain qualifies as "long-term," and is taxed at a lower rate, if it results from the sale of a capital asset held for more than 6 months (that was true in all the tax years in question). However, Jane still cannot be certain that her gain will count as long-term, because silver prices may have changed such that her profit, when she closes out all her contracts, comes instead from the sale of her contracts to *sell*, which under IRS rules is classified as a short-term capital gain no matter how long the contracts are held. 26 U.S.C. § 1233; *see Miller v. Commissioner of Internal Revenue*, 836 F.2d 1274, 1277 n. 2 (10th Cir.1988) (long-term capital gain, under the Code, can result only from the sale of contracts to buy, not contracts to sell).

So, upon closing out her futures contracts, Jane will have realized a gain in Year Two that offsets the loss resulting from the futures switch in Year One. Thus, she has deferred tax liability on her £ 15,000 for one year, and may also have converted it into long-term capital gain, which is taxed at a lower rate.

Although we believe, and the parties concede, that this example captures the essentials of the trading strategy involved in this case, the actual sequence and details of trades made on behalf of the taxpayers often varied from the example. For instance, some brokers used either put option straddles or call option straddles in Step A, but not both; some brokers used double

options (giving the holder the right either to buy or to sell); and some brokers repeated Step A several times, to generate larger gains and losses. Also, the example does not factor into the investor's losses the commissions paid to her broker. We have also exaggerated the numbers and market swings in this example in order to illustrate the underlying mechanics of the transactions. Brokers can successfully enter into this type of transaction with considerably smaller swings; and, through partial sales, they can balance gains and losses, so that the taxpayer ends up with ordinary income losses in Year One that almost exactly match the short or long-term capital gain that arises in Year Two. Finally, some investors use a different trading strategy called an "options hedge" strategy, which produces similar results to the "options straddle" strategy, but by different means.

## D. *Comment.*

At this point, we note that there appears to be a hidden flaw in Step A of the strategy, the "options straddle," which makes it seem unlikely that the strategy would work under real market conditions.

It at first appears that Jane has found a foolproof trading strategy for creating ordinary losses with offsetting capital gains. All of the options straddle transactions that the Tax Court describes, which it says are typical of those in the consolidated cases, seem to resemble Jane's transaction. This is puzzling, because Jane's strategy is not really a foolproof way to create *ordinary* losses. It works only where prices change fairly significantly. If we assume, contrary to our example, that silver prices stayed fairly constant for 6 or 7 months, then the *only* economic winners are those who *grant* options. The option buyers have paid them a fee for the chance to make money if the price changes significantly (up or down). The grantors (considered as a class) win and the buyers lose, if the prices do not vary enough to generate profits for the option buyer which exceed the premium paid for the option. Of course, Jane belongs to the class of option grantors as well as the class of option buyers. But, if she wins in her capacity of "option grantor" her win is *ordinary income*, and her *loss* is *capital loss*. She therefore would not obtain the tax advantage for which she hoped.

What puzzles us is that, were the silver market functioning normally, one would expect that the market would sometimes remain stable enough so that only option grantors could make any profit; so that buyers of both put and call options would have nothing to gain from exercising their options. After all, since options trading requires both grantors and buyers, over time the grantors' business must be about as profitable as the buyers' business. Otherwise, who would adopt an overall strategy of granting options? Those using the trading strategy at issue here sometimes should end up with capital losses and ordinary gains, and sometimes with capital gains and ordinary losses. Yet, *all* the cases before us involve capital gains and ordinary losses.

This apparently odd result could have occurred because silver prices in 1976–77 just happened to be particularly volatile, or because the persons involved in tax cases happened to be those who took deductions for ordinary income losses. A third possibility is that the brokers manipulated the premiums and strike prices to make certain that the loss took place in respect to granted options while the gain took place in respect to the purchased options. That is to say, the market may have been rigged. The government argued below that these cases were "factual shams." *See Forseth v. Commissioner,* 85 T.C. 127 (1985) (disallowing deductions from straddle trading, because the trades were a "factual sham" in that they never actually took place on a real market). But the Tax Court based its ruling on the assumption that the underlying transactions really took place at real market prices. Hence, we shall put aside any suspicions that the market was rigged and proceed on that same assumption, though it is particularly hard to see how, without market-rigging, the brokers could have lived up to the promoters' assurances, contained in promotional literature they

distributed, *see* p. 31, *infra*, that they could virtually guarantee this economically odd result.

## III.

### *The Basic Law*

To understand the legal arguments before us, one must keep in mind both the specific words of the tax code, and a special tax law doctrine called "sham in substance." The words of the tax code here at issue are the words "transaction entered into for profit," which appear in both Internal Revenue Code § 165 and in § 108 of the Deficit Reduction Act of 1984. Section 165 is the Internal Revenue Code's general loss deduction provision; it provides in relevant part that

> (a) **General Rule.**—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise ...
>
>    *     *     *     *     *     *
>
> (c) ... in the case of an individual, the deduction under subsection (a) shall be limited to ...
> (1) losses incurred in a trade or business;
> (2) losses incurred in any *transaction entered into for profit*, though not connected with a trade or business....

(emphasis added). Section 108 is a special provision that Congress enacted specifically to deal with commodity straddles "entered into before ... 1981." It did so because the tax consequences of many such transactions were still being litigated when Congress passed the Deficit Reduction Act in 1984. As amended in 1986, § 108(a) says that

> in the case of any disposition of 1 or more positions ... [which] form part of a straddle ... any loss from such disposition shall be allowed for the taxable year of the disposition if such position is part of a *transaction entered into for profit*.

(emphasis added). Congress enacted § 108 to clarify the application of the general loss deduction rule of § 165 to straddle transactions. Congress wanted to make clear that taxpayers *could* take a "straddle-position" loss in the year of disposition. *See* H.R.

Conf.Rep. No. 861, 98th Cong., 2d Sess. 916–17 (June 23, 1984), *reprinted in* 1984 U.S.Code Cong. & Admin.News 697, 1445, 1604–05 (expressing concern with the continuing "uncertainty" about, and litigation over, loss deductions for pre–1981 straddle trading). Prior to the enactment of § 108, the IRS had claimed that the sale of one leg of a straddle was not a "closed and completed" transaction; thus the taxpayer could not deduct losses from such a sale under § 165(c) until he disposed of the other leg of the straddle as well. *See Miller*, 836 F.2d at 1283; Internal Revenue Service Rev. Rul. 77–185, 1977–1 C.B. 48. Congress specified, however, that the taxpayer may take advantage of § 108 only if the transactions were "entered into for profit." If the Deweeses' transactions were not "entered into for profit," they cannot take advantage of § 108. For the same reason, they could not deduct their losses under § 165, because the losses would fall outside § 165(c). (It is conceded that they are not in a relevant "trade or business.")

A second relevant tax doctrine, the "sham in substance" doctrine, originated in *Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). In that case, the Supreme Court held that the taxpayer's corporate reorganization could be disregarded for tax purposes, even though it technically complied with tax code provisions, for it was not "the thing which the statute intended." *Id.*, 293 U.S. at 469, 55 S.Ct. at 267. The Court examined only the transaction on its face, not the motives of the taxpayer. It concluded that the reorganization was

> an operation having no business or corporate purpose—a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character.

*Id.* The Court held that the statute governing taxation of stock distributed on reorganization need not be applied; the sham transaction should be entirely disregarded for tax purpose because it "lies outside the plain intent of the statute." *Id.*, 293 U.S. at 470, 55 S.Ct. at 268.

Later decisions applied this doctrine to cases in which the transactions, though they actually occurred and technically complied with the tax code, were mere devices to avoid tax liability. *See, e.g., Knetsch v. United States,* 364 U.S. 361, 366, 81 S.Ct. 132, 135, 5 L.Ed.2d 128 (1960) (interest payments not deductible because "there was nothing of substance to be realized ... from this transaction beyond a tax deduction"); *DeMartino v. Commissioner of Internal Revenue,* 862 F.2d 400, 406 (2d Cir. 1988) (losses in oil futures straddle trading disallowed because they were "prearranged, contrived transactions conducted in a market rigged to produce tax losses"); *Neely v. United States,* 775 F.2d 1092, 1094 (9th Cir.1985) (a trust was not recognized for tax purposes because it had "no economic effect other than to create income tax losses").

The Tax Court in this case held that the London options transactions were a sham in substance. Hence, they fall outside the scope of § 108 and § 165, whether or not they fall within the literal words of these provisions. The court went on to suggest that it would reach the same conclusions under § 108 and § 165 (presumably meaning that it would find that the transactions were not "entered into for profit"). And, the court looked to other language in these sections to determine how, after disallowing the "loss" portions of the trading, the Commissioner should treat the "gain" portion of the trading. *Glass,* 87 T.C. at 1177; *see* § 108(c), discussed at p. 34, *infra.*

## IV.

### *The Arguments on Appeal*

#### A.

The Deweeses' first argument is that their transactions enjoyed a reasonable prospect of producing a genuine economic profit. To understand how this might be so, the reader must recall the assumption we said we would later relax, that the contango, *i.e.,* the insurance-and-interest-related difference between silver prices for different future months, would hold steady

at the rate of five pence per month. *See* p. 24, *supra.* In fact, contangos vary from month to month and even from day to day. Changes in interest rates, storage costs, or insurance rates can change a March/April differential that equals five pence in January to ten pence by February. Since the legs of straddles rest in different months, contango changes can create profits or losses. Indeed, commodities brokers and investors use straddles precisely in order to speculate on contango changes.

Also, contrary to our earlier assumption, the brokers did not always execute the offsetting legs of the straddle trades simultaneously. That is to say, a broker might buy a call option but fail to offset that transaction instantaneously by selling a call option, and the market could rise or fall in the interval.

■ The non-simultaneous execution of trades, and the possibility of contango changes, in the Deweeses' view, might well have produced real profits or real losses. How then, they ask, could the Tax Court find that their transactions were shams? The Deweeses argue further that, because their transactions enjoyed a "reasonable prospect" of profit, they fit directly within the "for profit" test of § 108, at least if we interpret those words in light of Congress' Conference Committee Report on § 108, where the House and Senate conferees (who wrote the provision in conference) said:

> In determining whether the [straddle] position is part of a transaction entered into for profit, it is intended that the provision be applied by treating the condition as satisfied *if there is a reasonable prospect of any profit* from the transaction.

H.R.Rep. No. 861, 98th Cong., 2d Sess. 917, *reprinted in* 1984 U.S.Code & Admin.News at 1605 (emphasis added).

■ In our view, however, the Tax Court could lawfully find the contrary. It could find that any prospect of profit was so remote as both to make the transactions shams, and to warrant the conclusion that they were "not entered into for profit." For one thing, the Tax Court was obligated

to give some deference to the Commissioner's view of the application of the sham in substance doctrine, and the "for profit" language, to the facts of this case. *See Bob Jones University v. United States*, 461 U.S. 574, 596, 103 S.Ct. 2017, 2031, 76 L.Ed.2d 157 (1983) (Supreme Court has "long recognized the primary authority of the IRS . . . in construing the Internal Revenue Code"); *Jewett v. Commissioner*, 455 U.S. 305, 318, 102 S.Ct. 1082, 1090, 71 L.Ed. 2d 170 (1982) (Commissioner's interpretation of tax code is "entitled to respect"); *Connor v. Commissioner of Internal Revenue*, 847 F.2d 985, 989 (1st Cir.1988). Moreover, the case law and the record in this case provide ample support for the Tax Court's application of the sham in substance doctrine, as well as for the alternative ruling that the losses would not be deductible under § 108, for the following reasons, taken together.

First, the Deweeses' case is one of 1,100 similar cases before the Tax Court. That court examined the Deweeses' transactions in the context of all the thousands of transactions in those cases. (It examined in detail 5 of the 1,100 cases, embodying facts that the IRS's summary witness said were "typical" of the trading patterns of six major brokers, and the Deweeses concede, for the purposes of this appeal, that their trading followed the typical straddle trading pattern described in the Tax Court's opinion.) The Tax Court was free to draw reasonable conclusions from the general pattern of transactions before it. That basic pattern is the one we have described at pp. 24–28, *supra*. And, this pattern is one designed to produce tax gains; it is not designed to produce real gains.

Second, American promoters for the Deweeses' broker, and the other brokers involved in this case, advertised the investment as an "income conversion and deferral program," designed (1) to convert ordinary income into capital gain, and (2) to defer capital gain taxable in the present year to (possibly long-term) capital gain taxed in future years. The advertisements said the broker would try to achieve ordinary income losses in Year One, an effort that, as a practical matter, would conflict

with an effort to make non-tax gains. Some promoters also advertised that the brokers used silver futures rather than other commodities because the price differences between various delivery months remains reasonably constant; this suggests that the brokers would not be trying to make non-tax profits by speculating on contango changes. Nothing in the brochures suggests that the brokers would try to make real profits or that the investors risked significant real losses. Whether or not the Deweeses themselves received these promotional materials, they provide evidence of the general nature and purpose of the trading strategy, especially since the results of the actual transactions so closely mirror the promoters' claims.

Third, each investor advanced his broker only a small amount of money, typically, ⅛ the amount of the "loss" that the broker would create. This money was used to open a "margin account," the amount of which, in genuine trading, should reflect the risk of loss to which the investor's account was exposed. But despite wide fluctuations in the net debits and credits in the investors' accounts, and periodic charges for interest, commissions, and premiums, none of the 1,100 investors *ever* received a "margin call" from his broker, asking that he pay more, so as to maintain a margin adequate to cover the losses and risks of his account. This fact is evidence that the brokers did not believe any investor would lose more money than his initial margin deposit would cover. These facts also suggest that the investment program achieved only what the promotional materials seemed to promise, namely a tax loss for a set fee, without exposing the investors to real risks and gains.

Fourth, although the investors' account balances at times showed net profits or losses, in each case, *after completing the whole series of transactions, no investor received any net profit, and no investor was ever asked to pay a loss, beyond the initial margin deposit.* And, no broker ever returned any of the initial margin deposit to an investor.

We can imagine investors (or commodities dealers) engaging in a strategy of real contango speculation through straddle trading, and we can also imagine the IRS picking out a subset of these real trades which, by chance, happened to resemble Jane's transactions described at pp. 24–28, *supra*. And, we agree that taxpayers may lawfully structure transactions that seek real gains in a way that also maximizes tax advantages. *See Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir.1934) (L. Hand, J.), *aff'd*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935) (a taxpayer lawfully "may so arrange his affairs that his taxes shall be as low as possible"). But this is not such a case. We cannot imagine that the case before us could be an instance of real contango speculation that, by chance, worked out adversely to the investors to the extent of losing their margin deposit. We cannot imagine this because *none* of the 1,100 London options investors' trading records shows any evidence of the real risks, profits, and losses that genuine contango speculation would create. And the odds against the trades of 1,100 genuine speculators, seeking real profits, just happening to fit the pattern of Jane's trading, and just happening to lose exactly the amount of their margin deposits, must be phenomenal. It might not be reasonable to think a coin was unbalanced because it lands "heads" once, but that conclusion becomes far more reasonable when "heads" turns up 1,100 times in a row.

We add that the Deweeses' own trading record fits the pattern we have described. They used, as brokers, Gardner–Lohmann and Amalgamated Metals Trading; Gardner handled the options straddles and Amalgamated handled the futures trading. The Deweeses paid Gardner an initial margin deposit of about $6,000 in 1976. Gardner, on their behalf, entered into a call option straddle which it closed after one day, and then a put option straddle, which it closed after four days. These straddles generated offsetting capital gains and ordinary losses. Gardner then transferred the balance, after commissions, of the Deweeses' margin deposit to Amalgamated, which entered into futures straddle and switch transactions, holding the futures contracts into 1977. The futures contracts, at particular times, fluctuated in value by more than a million pounds, but Amalgamated never asked the Deweeses for additional margin, and, at the end of all trading, the Deweeses' account balance was a mere $7.35 debit. The Deweeses reported to the IRS an ordinary loss of about $50,000 in 1976, and a capital gain of $44,000 in 1977.

These features of the case are sufficient, in our view, to permit the Tax Court to find these transactions to be "shams," and also to defeat the Deweeses' "reasonable prospect of profit" argument. Every circuit court that has considered the London options cases agrees. In *Yosha v. Commissioner of Internal Revenue*, 861 F.2d 494 (7th Cir.1988), the Seventh Circuit reviewed a London options case companion to this one. The court concluded that the transactions were not entered into for profit, because, among other things,

> the only money that ever passed between the parties was the deposit made by the investor with the broker. No money ever passed the other way—no margin calls were issued requiring the investor to supplement his initial deposit. The accounts were "zeroed out.".... no investor complained [about the lack of profits].

*Id.* at 500–01. *See also Killingsworth v. Commissioner of Internal Revenue*, 864 F.2d 1214, 1218 (5th Cir., 1989) ("viewed objectively," the London options transactions "appear to be devoid of profit making potential"); *Ratliff v. Commissioner of Internal Revenue*, 865 F.2d 97, 98 (6th Cir. 1989) (accord with *Yosha;* investors had no profits or losses beyond initial margin deposits, and all received ordinary losses in year one and capital gains in year two with "minimal" risk); *Kirchman v. Commissioner of Internal Revenue*, 862 F.2d 1486, 1493 (11th Cir.1989) (all taxpayers closed out their option straddles in the first year and incurred ordinary losses, regardless of effect on overall profitability; no taxpayer incurred a net gain or loss at the end of the trading; promotional materials stressed tax benefits; despite "incidental and mini-

mal risks of actual gains and losses," the "sole function of these transactions was to obtain [tax] deductions").

## B.

To understand the Deweeses' second argument, one must return to a legal issue that, for purposes of exposition, we have ignored, namely, the meaning of the words "transaction entered into for profit" in § 108. We assumed for the sake of argument, in Part IV(A) *supra*, that the Deweeses were correct that these words referred to an objective "reasonable prospect of profit" test, *see* p. 30, *supra*, but that is not really so.

■ The same words, "transaction entered into for profit" appear in the tax code's basic loss provision, § 165. And there, they have a well-established meaning. They mean that the taxpayers, in entering into the transaction, must have been primarily motivated by the desire to make a profit. This "profit motive" test originated in *Helvering v. National Grocery Co.*, 304 U.S. 282, 289 n. 5, 58 S.Ct. 932, 936 n. 5, 82 L.Ed. 1346 (1938), where the Supreme Court said that "the deductibility of losses under § 23(e)" (the predecessor of § 165(c)) "may depend on whether the taxpayer's motive in entering into the transaction was primarily profit." Since then, the courts have consistently applied this test in construing § 165(c). *See, e.g., United States v. Generes*, 405 U.S. 93, 105, 92 S.Ct. 827, 834, 31 L.Ed.2d 62 (1972) (§ 165 requires dominant profit motive); *King v. United States*, 545 F.2d 700, 708 (10th Cir.1976) (under § 165(c) taxpayer must show profit was primary motivation); *Knetsch v. United States*, 348 F.2d 932, 936, 172 Ct.Cl. 378 (1965) (primarily for profit test); *United States v. Keeler*, 308 F.2d 424, 434 (9th Cir.1962) (provision for deduction of losses has always been construed "in terms of the taxpayer's state of mind"); *Austin v. Commissioner of Internal Revenue*, 298 F.2d 583, 584 (2d Cir.1962) (in determining deductibility of loss, primary motive must be ascertained); *Ewing v. Commissioner of Internal Revenue*, 213 F.2d 438, 439 (2d Cir.1954) (pri-

mary profit motive test). *See also Fox v. Commissioner*, 82 T.C. 1001 (1984) (applying "primarily for profit" test to straddle transactions, under § 165(c)).

It is difficult, indeed impossible, to think Congress meant something different when it used the words "transaction entered into for profit" in § 108. For one thing, Congress, in enacting § 108, not only used language identical to that in § 165(c), but it apparently did so *in order to make clear* that taxpayers could take § 165(c)-type deductions in the year that the loss first took place. *Miller*, 836 F.2d at 1283. When Congress uses a term of art that has an established meaning, a heavy presumption arises that it intends to incorporate that meaning. *Morissette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240, 249, 96 L.Ed. 288 (1952); *see also Miller*, 836 F.2d at 1283 (a statute using language that has received "a long and consistent judicial interpretation in similar contexts is not a likely candidate for ambiguity").

For another thing, Congress, in 1986, amended § 108 so that its language now parallels almost perfectly that of § 165. It now permits tax deduction of the straddle loss position in the year the loss occurred

> if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business.

Tax Reform Act of 1986, Pub.L. No. 99–514 § 1808, 100 Stat. 2085, 2817 (1986); *cf.* § 165(c)(1 & 2). Congress apparently enacted this language in part to make clear that it had intended the two provisions to receive similar interpretations. *Landreth v. Commissioner of Internal Revenue*, 845 F.2d 828, 832–33 (9th Cir.1988) (vacated on rehearing, on other grounds); *see* H.R.Rep. No. 99–426, 99th Cong., 1st Sess. at 911 (Dec. 17, 1985) ("Section 108 also restated the general rule that losses from the disposition of a position in a straddle are only allowable if such position was part of a transaction entered into for profit. A majority of the United States Tax Court in *Miller* interpreted section 108 as providing a new, less stringent profit standard.... It was not the intent of Congress in enact-

ing section 108 to change the profit-motive standard of section 165(c)(2) or to enact a new profit motive standard for commodity straddle activities. This technical correction is necessary to end any additional uncertainty created by the *Miller* case").

Finally, the two circuits that have considered the question now agree that the "primary profit motive" test applies to § 108 as well as § 165. The Ninth Circuit, which had previously interpreted § 108 as the Deweeses advocate here, now agrees with the Tenth Circuit's holding in *Miller*, reversing the Tax Court, that the language means the same in both statutes. *Landreth v. Commissioner of Internal Revenue*, 859 F.2d 643, 648 (9th Cir.1988) (on rehearing); *Miller*, 836 F.2d at 1281 (conference report not conclusive as to meaning of § 108, because it is internally inconsistent and conflicts with other expressions of legislative intent).

But now that we have rejected the "reasonable prospects of profit" interpretation of § 108, the Deweeses' second argument comes into play. As we see it, that argument has two parts. First, they say Congress enacted § 108 specifically to deal with the kind of situation before us. One part of that statute, namely, § 108(a), deals with straddles that are "for profit." It provides that the taxpayer can deduct the losses incurred in such straddles. Another part of the statute, namely, § 108(c), specifically deals with straddles that are *not* "entered into for profit." Section 108(c) says that any loss from straddle trading that is not deductible under section 108(a) (because it is "not for profit") nonetheless

> shall be allowed in determining the gain or loss from dispositions of other positions in the straddle to the extent required to accurately reflect the taxpayer's net gain or loss from all positions in such straddle.

(Without this rule, the IRS conceivably could both disallow Jane's "unreal" losses, and unfairly impose a tax on her huge, equally "unreal" gains.) Since these two sections, taken together, offer a complete statutory framework in which to consider the London options cases, the "sham in substance" tax doctrine, one might argue, simply does not apply, for that doctrine takes a transaction *outside* the statutory framework, on the theory that Congress did not intend its statutes to cover "sham" transactions. *See* pp. 29–30, *supra.*

■ If one accepts this view, then one moves to the second part of argument, which is this: if § 108 governs the transaction, and if § 108 embodies the "primarily for profit" test, *See* pp. 33–34, *supra,* then the Tax Court should have given the Deweeses a chance to show that, *subjectively speaking,* they entered into these transactions primarily for profit. After all, if a gullible taxpayer, lured by the prospect of profit, can deduct his losses, say, from his "purchase" of the Brooklyn Bridge, the Deweeses argue that they should be able to deduct losses from what they *subjectively* believed was a chance to make money on the London options exchange, even if there was no real chance of making any profit. They correctly point out that, though the Tax Court heard subjective "profit-motive" testimony from a small sample of taxpayers, it did not rely in its opinion upon that testimony. Nor did the Tax Court give the Deweeses an opportunity to present such testimony about their own transactions. They say we should remand the case so they can present this testimony to the Tax Court.

Although we think that § 108 may well govern the transactions (for the reasons stated at p. 34, *supra* ), that § 108 does incorporate the "primarily for profit" test (for the reasons stated at pp. 33–34, *supra* ), and that the Deweeses did not have a fair opportunity to present profit motive testimony, we nonetheless reject their conclusion. That is to say, we believe the law does not require the Tax Court to give the Deweeses a hearing on their subjective motives. And, we have found three different lines of legal reasoning—three different legal lenses through which one might view this question—that support this result.

First, there is authority indicating that the Tax Court need not always take subjective testimony on motives underlying a loss

transaction, even where the question is governed by the "primarily for profit" test. Where the objective features of the situation are sufficiently clear, that court has the legal power to say that self-serving statements from taxpayers could make no legal difference, and that it would find the transaction was not "primarily for profit," regardless of any such statements. *See, e.g., Keats v. United States*, 865 F.2d 86, 88 (6th Cir.1988) (taxpayer "has produced affidavits which state that he possessed a profit motive for entering into the transactions," but "those affidavits do not explain the curious symmetry of the premiums paid and received" by the taxpayer); *Yosha*, 861 F.2d at 502 (although issues are often framed in terms of taxpayer's state of mind, analysis should focus on objective inquiry as to "whether any non-tax goals or functions were or plausibly could have been served" by the transactions); *Keane v. Commissioner of Internal Revenue*, 865 F.2d 1088, 1092 (9th Cir.1989) (losses were not deductible under § 108 because the transactions, considered objectively, "were designed and executed so as to have no economic effect other than the generation of tax benefits").

And, the Tax Court, in related cases, has indicated that the objective features of transactions like those here at issue are sufficient to overcome a taxpayer's own account of his profit-seeking state of mind. *See Miller v. Commissioner*, 84 T.C. 827, 836–37 (1985), *rev'd on other grounds*, 836 F.2d 1274 (10th Cir.1988) (transactions were primarily tax motivated, due to "pattern of switches" that realized tax losses while decreasing the possibility of obtaining a profit, despite taxpayers' self-serving testimony); *Smith v. Commissioner*, 78 T.C. 350 (1982) (petitioners' uncorroborated profit-motive testimony was "of no probative value"); *Siegel v. Commissioner*, 78 T.C. 659, 699 (1982) (greater weight is to be accorded objective facts than self-serving statements as to intent); *Bessenyey v. Commissioner*, 45 T.C. 261, 273–74 (1965), *aff'd*, 379 F.2d 252 (2d Cir.1967) (record of continued losses or unlikelihood of profit may be an important factor bearing on taxpayer's true intention); *see also Fleisch-*

*er v. Commissioner*, 403 F.2d 403, 406 (2d Cir.1968) (in ascertaining taxpayers' intent, court is not bound by their assertions of proper motive, even if uncontradicted).

We must concede, however, that, though the Tax Court has the legal power to disregard the Deweeses' profit motive testimony, it did not explicitly state that it was exercising that power; in light of this fact, we should not rely on these cases alone.

Second, the Tax Court explicitly, and lawfully (*see* pp. 30–33, *supra* ), found that the Deweeses' transactions were "shams in substance." Case law makes clear that a taxpayer cannot deduct a "sham transaction" loss, irrespective of his subjective profit motive. *See Knetsch*, 364 U.S. at 365, 81 S.Ct. at 134 (court "put aside" district court's finding concerning motive, in determining whether transaction was sham); *Gregory*, 293 U.S. at 469, 55 S.Ct. at 267 (under sham in substance analysis, court must look at "what was done," apart from the taxpayer's "motive"); *Kirchman*, 862 F.2d at 1490 ("whether a transaction is a substantive sham ... does not necessarily require an analysis of a taxpayer's subjective intent;" "transactions whose sole function is to produce tax deductions are substantive shams, regardless of the motive of the taxpayer").

And, one need not view the "sham in substance" doctrine as *always* taking a transaction entirely outside its statutory framework. One could view it more simply and more generally as an interpretive tool that helps courts read tax statutes in a way that makes their technical language conform more precisely with Congressional intent. Thus, one could view this type of "sham" transaction as a special subset of transactions not "entered into for profit" within the meaning of § 108. The conceptual virtues of doing so are: (1) permitting § 108(c) to govern the treatment of other portions of the transaction; and (2) conforming to Congress' apparent object in writing § 108, namely, to create a provision that would govern cases such as the one before us. Doing so interferes with no Congressional objective; it is not reason-

able, given the history and language of § 108, to believe that Congress, in enacting that provision, wished to weaken the "sham in substance" doctrine by mandating the consideration of subjective factors. That is to say, we need not accept the dilemma: 'Either (1) the "sham in substance" doctrine applies, *or* (2) § 108 applies and "subjective motive" is relevant.' Rather, we see no conceptual difficulty in saying that *both* the "sham in substance" doctrine and § 108 apply, the former doctrine defining a special subset of transactions that are not "entered into for profit" under the latter statute. Under this view, "sham" transactions would lie *inside*, not *outside*, the "plain intent of the statute." *Gregory*, 293 U.S. at 470, 55 S.Ct. at 268. We need not authoritatively underwrite this point of view, for there is still a third approach.

Third, one could simply see the Tax Court as having applied traditional "sham in substance" analysis. As traditionally used, this doctrine takes the transaction out of the statutory provision. But, in this instance, that fact made no difference. The Tax Court simply said that the Commissioner should treat the entire set of transactions *as if* the Congressional directive in § 108(c) (about how to treat "not for profit" transactions) applied. *Glass*, 87 T.C. at 1177. As long as the Tax Court has the lawful power to direct how the Commissioner should treat a sham transaction (and no one here denies that power), the question of whether the sham transaction falls inside, or outside, the statutory provision is only of metaphysical interest, and makes no practical difference.

We need not choose among these three different conceptual ways of addressing the problem. That is because all three roads lead to Rome. The transactions so clearly lack any significant possibility of profit (tax advantages aside) that the taxpayer cannot deduct the loss; the Commissioner must treat the transactions in accordance with § 108(c); and the Tax Court could lawfully reach these conclusions without hearing subjective profit motive testimony from the taxpayers.

The judgment of the Tax Court is

AFFIRMED.

JOHN R. BROWN, Circuit Judge, concurring.

I concur without reservation of any kind in both the result and the brilliant opinion of my brother Breyer. I file this concurrence for reasons entirely unrelated to the intrinsic merits, or perhaps more accurately, the intrinsic non-merits of the appeal.

This whole episode, although the outgrowth of over 1,000 cases consolidated by the Tax Court for trial and disposition, *Glass v. Commissioner*, 87 T.C. 1087 (1986), has now occupied the extended attention of *six*[1] of the Courts of Appeals[2] resulting in seven decisions, all in favor of the Government.

Without disparaging counsel in this nationwide effort,[3] this is a colossal waste, a squandering, of precious judicial energy of at least 18 to 21 Judges at a time in which there is great concern over the capacity of the Federal Appellate System to handle the

---

1. *Dewees v. Commissioner*, 870 F.2d 21 (1st Cir. 1989).
   *Killingsworth v. Commissioner*, 864 F.2d 1214 (5th Cir.1989).
   *Keats v. U.S.*, 865 F.2d 86 (6th Cir.1988).
   *Ratliff v. Commissioner*, 865 F.2d 97 (6th Cir. 1989).
   *Yosha v. Commissioner*, 861 F.2d 494 (7th Cir.1988).
   *Keane v. Commissioner*, 865 F.2d 1088 (9th Cir.1989).
   *Kirchman v. Commissioner*, 862 F.2d 1486 (11th Cir.1989).

2. Estimating the burden on each of the other five Courts of Appeals, what has occurred in the First Circuit is likely typical of the others. The initial briefs totalled over 120 pages, not including 85 pages of the Tax Court's opinion and supplemental briefs of 30 pages which were brought about by the order of November 28, 1989, to respond to a 16–page hypothetical. This was followed by Judge Breyer's 50–page opinion for us.

3. Collectively, the cases are reported to involve $100 million in lost revenues to the Government or, conversely, to the taxpayers. Also, lurking

ever-growing case load.[4]

Considering the likelihood that this scenario might be repeated, action by the Congress or the Judiciary are both imperative. Fortunately, there is a model of Congressional–Judicial collaboration in the establishment and operation of the multi-district panel. 28 U.S.C. § 1407.

Valuable as "ventilation" by the Courts of Appeals may occasionally be to the Supreme Court in its equally taxing role, what we have here is not ventilation. Rather, the Federal Judiciary is windswept by this hurricane.

in the background are 25,000 individual taxpayers' claims in related situations.

**4.** *See* the one and only ever conference of all United States Circuit Judges held in Washing-

ton, D.C. (Oct. 23–26, 1988). *See also* Federal Courts Study Act, Pub.L. No. 100–702, §§ 102–09, 102 Stat. 4644–45 (1988) (establishing the Federal Courts Study Committee).