945 F.2d 344
 68 A.F.T.R.2d 91-5672, 91-2 USTC P 50,462
 Edward BOHRER and Gwenyth Bohrer, Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Appellee.
Glen SHEPPARD and Joaquina Sheppard, Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Appellee.
Nick C. SCHOLZEN and Erroleen Scholzen, Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Appellee.
Michael G. HARRIS and Nancy S. Harris, Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Appellee.
Douglas C. STEWART and Mary L. Stewart, Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Appellee.
Clarence Wm. PACK and Pat F. Pack, Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Appellee.
David A. SCHOLZEN and Judy Scholzen, Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Appellee.
Rex H. CROCKETT, Deceased, and Jeanne M. Crockett, Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Appellee.
James J. KOEHLER and Alice Koehler, Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Appellee.
Lincoln C. WHITE and Aline White, Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Appellee.
S. Arthur GREGERSON and Montess Gregerson, Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Appellee.
Lincoln C. WHITE and Jean White, Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Appellee.
Harold L. CANADA and Dorothy F. Canada, Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Appellee.
Robert H. BURGENER and Diane Burgener, Appellants.
v.
COMMISSIONER OF INTERNAL REVENUE, Appellee.
 Nos. 87-2240 to 87-2243, 87-2245 to 87-2247, 87-2249,
87-2252, 87-2253, 88-1037, 88-1476, 88-1477 and 88-1771.
 United States Court of Appeals,
Tenth Circuit.
 Sept. 19, 1991.
 
 Martin M. Ruken of Vedder, Price, Kaufman & Kammholz, and Kenneth C. Shepro of Altheimer & Gray, Chicago, Ill., for petitioners-appellants.
 William S. Rose, Jr., Asst. Atty. Gen., and Gary R. Allen, Richard Farber, and Kenneth L. Green, Attys., Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.
 Before HOLLOWAY and ANDERSON, Circuit Judges, and THOMPSON*, Chief District Judge.
 HOLLOWAY, Circuit Judge.
 
 
 1
 These fourteen companioned appeals arise out of the Tax Court decision of Glass v. C.I.R., 87 T.C. 1087 (1986), which involved the largest consolidated proceeding in Tax Court history, consisting of approximately 1,100 cases involving identical issues. The controlling issue of Glass and the instant appeals is whether certain deductions arising out of appellants' "straddle trading" of futures and options on the London Metal Exchange (LME) were proper. The Tax Court held that the deductions were improperly taken and we affirm that decision.
 
 
 2
 * The appellants claimed ordinary loss deductions, pursuant to I.R.C. §§ 165(a) and 165(c)(2), allowing deductions for "any loss sustained during the taxable year and not compensated for by insurance or otherwise, [and] ... incurred in any transaction entered into for profit, though not connected with a trade or business."[1] The losses in question were sustained in the years 1975 to 1980 in connection with straddle transactions conducted on the LME.
 
 
 3
 A straddle transaction, in general, involves the purchase or sale of offsetting futures contracts or options, each of which is termed a "leg" of the straddle. In these transactions, the first contract was usually a call option, sold or "granted" by the investor to a third party and allowing that party to purchase a specific amount of a commodity for a certain price in a future month. The second contract in this instance would be a call option, purchased by the investor and allowing the investor to purchase the same amount of the same commodity for a certain price in another future month.[2] If the price of the commodity goes up, the value of the call option sold to the third party and obligating the investor to sell at the old lower price becomes less valuable to the investor. Simultaneously, the value of the contract allowing the investor to purchase at the old lower price becomes more valuable to the investor. Thus, in an up market, the sold option leg becomes a loss leg, worth less than it was purchased for, and the purchased option leg becomes a gain leg, worth more than it was purchased for. The net value for both contracts together, however, will be nearly zero as the gain and the loss largely cancel each other out.[3]
 
 
 4
 The possible tax benefits of such transactions were thought to result from a private letter ruling of the Internal Revenue Service (IRS) which came to be known as the "Zinn Ruling." See Glass, 87 T.C. at 1153. This ruling apparently applied I.R.C. § 1234 and indicated that the IRS would treat a gain or loss on a granted option as ordinary, but would treat a gain or loss on a purchased option as a capital gain, and a long term capital gain if held over six months.[4] The critical aspect of this imbalance, which was taken advantage of in these cases is that a loss on a granted option was considered an ordinary loss, while a gain on a purchased option was considered a capital gain. The claimed tax benefits were to be obtained by closing out both legs through offsetting positions, such as the purchase of an option like that sold by the investor and the sale of an option like that purchased by the investor. Thus, the loss from the granted option leg is claimed as an ordinary loss and the gain from the purchased option leg is treated as a capital gain.
 
 
 5
 The next step in the transaction is to attempt to convert the short term capital gain into a long term capital gain to further lessen the tax burden from the deferred income. This was accomplished by entering into a futures straddle at the same time that the option straddle was entered into. A futures straddle is similar to the option straddle and in these instances generally consisted of the simultaneous purchase and sale of futures contracts for identical quantities of the same commodity with different delivery dates. Thus, when the option straddle legs were closed out, the loss leg of the futures straddle would be closed out, giving an ordinary loss to offset the capital gain of the purchased option straddle leg. The remaining gain leg of the futures straddle could then be closed out at a profit after six months, making the gain taxable as a long term capital gain. The net result of this rather convoluted transaction was that the investor could realize and deduct an ordinary loss in year one and could then recoup the loss in year two, with the income taxed at the lower long-term capital gain rate. More specific details of such transactions are thoroughly presented by the Tax Court in Glass and thus, we will not elaborate further in this opinion. See Glass, 87 T.C. at 1104-1153; see also Dewees v. C.I.R., 870 F.2d 21 (1st Cir.1989) (another appeal from Glass, providing an explanation of the mechanics of the Glass type transactions, including a simplified hypothetical transaction); Miller v. C.I.R., 836 F.2d 1274, 1276-78 (10th Cir.1988) (describing commodity straddle transactions).
 
 
 6
 The Commissioner of Internal Revenue (C.I.R.) disallowed these LME straddle deductions, claiming inter alia, that the underlying year one losses were incurred in transactions which were factual shams lacking in economic substance and which were not entered into for profit.
 
 
 7
 In Glass, the Tax Court consolidated approximately 1,100 cases involving disallowed deductions of over $61 million arising from LME straddles. Rather than address the factual sham issue, Glass was decided with the court assuming, without deciding, that the "commodity options and futures contracts which petitioners entered into were actual contracts." Id. at 1172. Thus, the focus of the court was on the question whether the transactions, even if they took place as claimed, could achieve the tax results claimed by the petitioners. The Tax Court held that they could not, stating that "the London option [LME] transaction--petitioners' multiple and complex tax straddle scheme encompassing prearranged results--lacked economic substance and was a sham. Petitioners consequently may not deduct the losses claimed by them in year one of their straddle transactions." Glass, 87 T.C. at 1177.
 
 II
 
 8
 In these appeals the appellants challenge the Tax Court decision, arguing first that the trades did occur as claimed; second, that these transactions were not sham; and third, that if the transactions were not sham in substance, then remand is required for a determination whether the transactions were entered into for profit.
 
 
 9
 While this circuit has not yet addressed an appeal of Glass petitioners, appeals from Glass have already been taken and decided in the First, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth and Eleventh Circuits. Each of these courts has affirmed the Tax Court's decision. See Lee v. C.I.R., 897 F.2d 915 (8th Cir.1989); Kielmar v. C.I.R., 884 F.2d 959 (7th Cir.1989); Dewees v. C.I.R., 870 F.2d 21 (1st Cir.1989); Friedman v. C.I.R., 869 F.2d 785 (4th Cir.1989); Keane v. C.I.R., 865 F.2d 1088 (9th Cir.1989); Ratliff v. C.I.R., 865 F.2d 97 (6th Cir.1989) (adopting Seventh Circuit Yosha opinion, infra ); Killingsworth v. C.I.R., 864 F.2d 1214 (5th Cir.1989); Kirchman v. C.I.R., 862 F.2d 1486 (11th Cir.1989); Yosha v. C.I.R., 861 F.2d 494 (7th Cir.1988); Herrington v. C.I.R., 854 F.2d 755 (7th Cir.1988), cert. denied, 490 U.S. 1065, 109 S.Ct. 2062, 104 L.Ed.2d 628 (1989). We find the analysis and commentary of these opinions, as well as that of the Tax Court in Glass, to be persuasive.
 
 
 10
 The Tax Court's sham analysis in Glass was grounded on the Supreme Court's rationale in Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1934). See 87 T.C. at 1175-77. In Gregory the Court held that a business reorganization which was "conducted according to the terms of [the statute], was in fact an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else." Id. 293 U.S. at 470, 55 S.Ct. at 268. As such, the Court focused on substance over form and held that the "transaction upon its face lies outside the plain intent of the statute" and would not generate the desired tax benefits. Id. The disallowance of sham transactions has since been applied in a variety of contexts. See, e.g., Knetsch v. United States, 364 U.S. 361, 366-67, 81 S.Ct. 132, 135-36, 5 L.Ed.2d 128 (1960); James v. C.I.R., 899 F.2d 905, 908-09 (10th Cir.1990); DeMartino v. C.I.R., 862 F.2d 400, 406 (2d Cir.1988); Neely v. United States, 775 F.2d 1092, 1094 (9th Cir.1985).
 
 
 11
 In Glass, the Tax Court held that the LME transactions were sham even if they did comply with the letter of the tax code. In reviewing a Tax Court finding of a sham transaction, we review the underlying findings of fact for clear error and we then review de novo the legal determination that the transaction is sham. James, 899 F.2d at 909. We have stated that "a transaction will be accorded tax recognition only if it has 'economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached.' " James, 899 F.2d at 908 (quoting Frank Lyon Co. v. United States, 435 U.S. 561, 583-84, 98 S.Ct. 1291, 1303-04, 55 L.Ed.2d 550 (1978)).[5]
 
 
 12
 The Glass opinion and the subsequent courts of appeals opinions reviewing Glass are replete with details indicating that these LME transactions were conducted solely for tax-avoidance with no reasonable possibility of profit. In Glass, the Tax Court noted that although the overall transaction held a slight chance for a profit, it was inevitable that the first year would generate a loss due to the closing of the loss leg. "The intentionally realized losses in year one were not necessary or helpful in profiting from difference gains in petitioners' commodity straddle transactions." Glass, 87 T.C. at 1176.
 
 
 13
 Dewees points out that the advertising materials for the LME transactions all stressed the income conversion and deferral aspects, with no mention of any possibility of real losses or gains. 870 F.2d at 31. Also noted was the fact that despite supposed market fluctuations, no petitioner "ever received a 'margin call' from his broker." Id. (emphasis in original). Advertising alone, of course, does not dictate the nature of the transactions; however, it gains evidentiary force when combined with the fact that the individual transactions mirrored those described in the advertisements. As noted by the First Circuit,
 
 
 14
 although the investors' account balances at times showed net profits or losses, in each case, after completing the whole series of transactions, no investor received any net profit, and no investor was ever asked to pay a loss, beyond the initial margin deposit.... And the odds against the trades of 1,100 genuine speculators, seeking real profits ... just happening to lose exactly the amount of their margin deposits, must be phenomenal.
 
 
 15
 Id. (emphasis in original).
 
 
 16
 We are persuaded to agree with the conclusion of Chief Judge Lay in Lee v. C.I.R., 897 F.2d 915, 917 (8th Cir.1989) that
 
 
 17
 these straddle options were substantive shams. The London options transactions were designed, promoted, and executed for the sole purpose of tax avoidance. The transactions lacked economic substance. As such, they are outside the purview of §§ 165(c)(2) [I.R.C.] and 108 of the [Tax Reform Act of 1984].
 
 
 18
 Accordingly, the decision of the Tax Court is
 
 
 19
 AFFIRMED.
 
 
 
 *
 The Honorable Ralph G. Thompson, Chief Judge of the Western District of Oklahoma, sitting by designation
 
 
 [1]
 The appellants also rely upon § 108 of the Tax Reform Act of 1984, codified at I.R.C. § 1092 note (West Supp.1991). The Tax Reform Act of 1984 was passed as Division A of the Deficit Reduction Act of 1984. Pub.L. No. 98-369, 98 Stat. 494 (1984). Section 108 allows deductions for commodity straddle transactions "entered into for profit." Section 108 was passed after the final trial session of Glass, but was deemed by all parties to retroactively apply to these transactions. See Appellants' Br., Addendum D
 We have stated that in regards to both I.R.C. § 165 and § 108 of the Tax Reform Act of 1984, "[t]he meaning of 'transaction entered into for profit' has been settled at least since 1938, when the Supreme Court indicated that a subjective standard is applied and the taxpayer's primary motive must be one of profit." Miller v. C.I.R., 836 F.2d 1274, 1280, 1285 (10th Cir.1988).
 
 
 [2]
 The straddle involving call options is but one variation of the strategies employed by the LME trading firms on behalf of their clients. For example, other strategies involved the purchase and sale of put options, which allow the holder to sell a set amount of a given commodity for a certain price in a future month
 There is also a strategy called an option-hedge in which the investor purchases a futures contract, allowing him to purchase a specific amount of a commodity for a certain price in a future month. Almost simultaneously, the investor grants a call option for the same amount of the commodity at a certain price for a future delivery. The intricacies of the various strategies are detailed in the opinion of the Tax Court and need not be related here. See Glass, 87 T.C. at 1104 et seq.
 
 
 [3]
 Due to differences in delivery dates for the commodities and other factors there will usually be some variance in the values of the offsetting straddle contracts
 
 
 [4]
 Congress later negated the effects of the Zinn Ruling by amending I.R.C. § 1234(b) to provide that gain or loss from a closing option transaction, granted or purchased, is to be treated as short term capital gain or loss. See Pub.L. 94-455, 90 Stat. 1929 (1976)
 
 
 [5]
 Appellants argue that the Tax Court has performed a circular analysis because it reasons that it need not rule on profit objective because the transactions were sham, yet determines that the transactions were sham because there was no profit objective. Appellant's Br. at 29-30. The argument fails to recognize that identification of a sham transaction can be made by determining that the transaction has no "economic substance" or "practical economic effects other than the creation of income tax losses." James, 899 F.2d at 908-09. Since practical economic benefits are ordinarily construed as profits, a showing that objectively there is no possibility for profit in a transaction can show that the transaction was lacking in economic substance. Thus, the fact that possibilities for profit are discussed by the Tax Court is only reflecting the sham analysis, not an "entered into for profit" analysis of I.R.C. § 165(c)(2) or § 108 of the Tax Reform Act of 1984. See Yosha, 861 F.2d at 499 ("By either standard--'no nontax motive or consequences,' the test under the judge-made doctrine of substance over form, applicable to all deductions, or 'no predominant nontax motive,' the statutory test applicable to the deduction of losses--this is an easy case.")