FREDERICK A. AND MARTHA G. ALLING, ET AL.,[1] PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6197–84, 15748–84,   Filed February 24, 1994.
29586–84, 31737–84,
37132–84,  5676–85,
29996–85, 41809–85,
39519–86, 45975–86,
29527–87, 27523–88,
5214–89, 22733–90.

*Hugh Janow*, for petitioners.
*Theodore J. Kletnick* and *Maria T. Stabile*, for respondent.

OPINION

TANNENWALD, *Judge*: The parties having settled all but one issue, this case comes before the Court fully stipulated under Rule 122[2] by certain petitioners, on the issue of the tax treatment of the gains in the years involved herein from commodity tax straddles where the losses from those strad-

---

[1] Cases of petitioners listed in the appendix were previously consolidated for purposes of trial, briefing, and opinion as to the issue presented, although at this point in time, only some of those petitioners, see *infra* p. 324, are now before us on this issue.

[2] Unless otherwise indicated, all statutory references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

dles were improperly deducted in the previous year but cannot be disallowed due to the statute of limitations.

The transactions in question were of the same type and essentially the same transactions at issue in *Fox v. Commissioner*, 82 T.C. 1001 (1984) (*Fox* transactions), and all involved the Arbitrage Management Investment Co. (AMIC).

Petitioners with respect to whom this issue is to be resolved, their residences at the time of filing of their petitions, and the years and amounts of the deficiencies determined against them by respondent are as follows:

| Docket No. | Petitioner | Residence | Year | Deficiency [1] |
|---|---|---|---|---|
| 6197–84 | Milton and Blanche Wasserberger | Fort Lee, N.J. | 1979 | $23,609.00 |
| 15748–84 | Estate of Jerome Casser, deceased, Barry Casser, executor Estate of Charlotte Casser, deceased, Barry Casser, executor | Englewood, N.J. | 1979 | 25,568.00 |
| 29586–84 | Joseph and Alda Casser | Joseph-Closter, N.J. Alda-Norwood, N.J. | 1979 | 26,366.00 |
| 31737–84 | Roy and Antoinette Chapman | Rego Park, N.Y. | 1980 | 17,589.52 |
| 37132–84 | Rony and Ellen Kessler | West Hempstead, N.Y. | 1979 | 34,355.00 17,512.00 |
| 5676–85 | Conrad K. Sterrett | New York, N.Y. | 1978 1979 | 50,057.00 22,283.00 |
| 29996–85 | Donald and Marguerite Toresco | Watchung, N.J. | 1979 | 78,793.00 |
| 41809–85 | Estate of Mary L. Burkholder, deceased, Guy S. Burkholder, II executor, and John J. Burkholder, Jr., executor | Lancaster, Pa. | 1979 | 34,093.00 |
| 39519–86 | Charles Diamond and Hana Diamond | Great Neck, N.Y. | 1977 | 107,155.00 |
| 45975–86 | Ubaldo and Nellie Gonzalez | Commack, N.Y. | 1979 1980 | 11,473.00 3,305.00 |
| 29527–87 | Benjamin and Judith Handelman | New York, N.Y. | 1980 1981 [overassessment] | 72,293.00 25,871.00 [overassessment] |
| 27523–88 | Beno and Lisa Sternlicht | Schenectady, N.Y. | 1980 | 100,350.00 |
| 5214–89 | Herbert and Irene Freiman | Merrick, N.Y. | 1980 | 188,738.00 |
| 22733–90 | Gerald D. Vogel | New York, N.Y. | 1980 1981 | 353,015.00 289,090.00 |

[1] Some of the notices of deficiency assert additional interest under sec. 6621.

In accordance with the stipulation of the parties, the findings of fact adopted by the Court in *Fox v. Commissioner, supra,* are incorporated by reference, including the fact that

the transactions involved herein were not entered into primarily for profit purposes as required by section 165. To facilitate understanding of our analysis, further facts stipulated by the parties are hereinafter set forth.

The off exchange market in which the trades at issue were executed was unique and specialized and was created and administered by a brokerage firm known as AMIC. The AMIC market was characterized by features unusual for options markets, such as tying options to specific Treasury bills, trading primarily in put options, and trading only in vertical put option spreads.

Trading by customers of AMIC in over-the-counter Treasury bill options displayed distinct patterns: (1) Trading was markedly seasonal; i.e., the bulk of all trades was executed in November, December, and then in January of the following year; (2) the customers of AMIC commonly engaged in identical trading sequences; and (3) very few customers realized net economic profits on their transactions in vertical put options.

At all times relevant to these cases, AMIC executed trades almost exclusively between and among its own customers and not with outside parties.

The basic tax strategy, or template, generally utilized in the AMIC market was comprised of a series of transactions, as follows:

(1) In the fall of the initial year (year I), the participant establishes a spread comprised of a long T-bill put option (for example, long 97.75, expiration 3/28/79[3]) and a short T-bill put option (for example, short 97.625, expiration 3/28/79). This is commonly referred to as the initiation step.

(2) Later that same year, the participant closes the long T-bill put option position (the long 97.75, expiration 3/28/79) through offset using a short T-bill put option (short 97.75, expiration 3/28/79) and simultaneously establishes a new, slightly different long position (for example, long 98.8125, expiration 3/28/79). This is commonly referred to as the "switch" step. For tax purposes and brokerage accounting, the short position described in this paragraph (2) closed the long position referred to in paragraph (1) (long 97.75, expiration 3/28/79) and the short position of paragraph (1) together

---

[3] The actual initial year varied from 1976 through 1979 for petitioners herein.

with the long position in this paragraph (2) (short 97.625, expiration 3/28/79) comprise a new, slightly different spread position.

(3) Early the next year (year II), the long and short position remaining open would be closed out for tax and accounting purposes. This is commonly referred to as the closeout step.

(4) This trading strategy would typically result in claimed ordinary losses on the long puts in both year I and year II and short-term capital gains on the short puts in year II.

(5) This trading strategy would usually be repeated in the fall of year II, although there would be a break between series (spring and summer) and, thus, no transactional link or relationship to the prior series of trades.

Each disposition of a long or short position in a series of *Fox* spread transactions has been treated as a separate transaction for purposes of recognition of loss and gain. Generally, each *Fox* trading series was comprised of one initiation spread (paragraph (1)), a switch (paragraph (2)), both at the end of the initial year, and a liquidation early in the next taxable year (paragraph (3)). See *Fox v. Commissioner*, 82 T.C. at 1003 (1978-79 series).

A variation of the above-described strategy involved an option spread series in which no switch was utilized. Both the long and short legs would be closed simultaneously. A participant would claim losses in year I based on the use of the trade date for reporting losses, while gains would be included in year II based on the position that gains are reportable on the settlement date.

A separate strategy and series involved the use of T-bond options to generate putative short-term and long-term losses and gains.

Generally, with respect to a spread series (see paragraphs (1)–(5) above for a description of the components), losses realized late in the year would be claimed in year I of the spread series, while gains realized early in the year from that same spread series would be included in year II. The trading sequence described in paragraphs (1) to (3) would comprise spread series No. 1. In year II, all petitioners involved herein began a new spread series, which for purposes of this example would be spread series No. 2. Petitioners claimed losses from spread series No. 2 in year II (the

first year of spread series No. 2) and included gains in year III (the second year of spread series No. 2).

The issue in this case is whether petitioners may exclude gain from the second leg of straddles in a year not barred by the statute of limitations in the amount of the losses from the first leg of such straddles which they deducted in a year which is so barred.[4]

Resolution of this issue involves an examination of two questions: (1) Is section 108(c) of the Deficit Reduction Act of 1984, Pub. L. 98–369, 98 Stat. 494, 630, as amended by section 1808(d) of the Tax Reform Act of 1986, Pub. L. 99–514, 100 Stat. 2817 (hereinafter section 108(c)), dispositive of the issue before us; (2) aside from section 108(c), does the "duty of consistency" doctrine apply to petitioners and, if it does, to what extent have the elements of that doctrine[5] been satisfied; and (3) to what extent is the result herein impacted by alleged inconsistent action by respondent. For the most part, the parties have devoted their attention to the application of the "duty of consistency" doctrine to petitioners, with the role of section 108(c) relegated to secondary consideration.

We think that the disposition of this case turns, at least in the first instance, upon the scope of section 108(c), and it is that problem to which we first turn our attention. Before doing so, we think it important to note what is not involved herein. The stipulation of the parties states that the transactions involved herein were "Fox transactions"; i.e., "of the same type and essentially the same as the transactions at issue in *Fox v. Commissioner*, 82 T.C. 1001 (1984)", that the findings of fact in *Fox* are incorporated into the facts of this case, and that petitioners "did not enter into their Fox transactions for the 'for profit' purpose required by Internal Revenue Code § 165 (e.g., primarily for profit)". Thus, the issues

---

[4] We refer in the singular to the barred year in the sentence above and hereinafter since we need only discuss the treatment of the barred year immediately preceding each petitioner's first open year before us, despite the fact that (as detailed in the chart *supra* p. 324) petitioners have a variety of tax years before this Court and as a result the "barred year" differs for the various petitioners from 1976 to 1979.

[5] The elements of the "duty of consistency" doctrine are stated as follows in *Unvert v. Commissioner*, 72 T.C. 807, 815 (1979) (quoting *Beltzer v. United States*, 495 F.2d 211, 212 (8th Cir. 1974)), affd. 656 F.2d 483 (9th Cir. 1981):

"(1) the taxpayer has made a representation or reported an item for tax purposes in one year,

(2) the Commissioner has acquiesced in or relied on that fact for that year, and

(3) the taxpayer desires to change the representation, previously made, in a later year after the statute of limitations on assessments bars adjustments for the initial tax year."

of the characterization of *Fox* type transactions as being without economic substance and therefore "sham", and of the consequences flowing therefrom, are not before us.[6] Cf. *Ewing v. Commissioner*, 91 T.C. 396 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991). Accordingly, although the parties rely on or distinguish, as it suits their purposes, the cases applying the "duty of consistency" to "sham" transactions,[7] we will refrain from making any determination that the transactions involved herein were without economic substance and therefore substantive shams. See *infra* p. 336 for further comment on this aspect of the situation.

Section 108 provides in pertinent part as follows:

(a) GENERAL RULE.—For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or more positions—

(1) which were entered into before 1982 and form part of a straddle, and

(2) to which the amendments made by title V of the Economic Recovery Tax Act of 1981 do not apply,

any loss from such disposition shall be allowed for the taxable year of the disposition if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business.

(b) LOSS INCURRED IN A TRADE OR BUSINESS.—For purposes of subsection (a), any loss incurred by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business.

(c) NET LOSS ALLOWED.—If any loss with respect to a position described in paragraphs (1) and (2) of subsection (a) is not allowable as a deduction (after applying subsections (a) and (b)), such loss shall be allowed in determining the gain or loss from dispositions of other positions in the straddle to the extent required to accurately reflect the taxpayer's net gain or loss from all positions in such straddle.

---

[6] The stipulation herein should be contrasted with the stipulation involved in *Fox v. Commissioner*, T.C. Memo. 1988–570, revd. sub nom. *Horn v. Commissioner*, 968 F.2d 1229 (D.C. Cir. 1992), affd. sub nom. *Lerman v. Commissioner*, 939 F.2d 44 (3d Cir. 1991), and *Kazi v. Commissioner*, T.C. Memo. 1991–37, which provided that the transactions involved therein were the same type involved in *Glass v. Commissioner*, 87 T.C. 1087 (1986).

[7] The leading case dealing with the relationship of the "duty of consistency" in an open year with respect to treatment of a straddle transaction in a barred year where the transactions are substantive shams is *Herrington v. Commissioner*, 854 F.2d 755 (5th Cir. 1988), affg. *Glass v. Commissioner*, 87 T.C. 1087 (1986); see also *Kielmar v. Commissioner*, 884 F.2d 959 (7th Cir. 1989), affg. *Glass v. Commissioner*, 87 T.C. 1087 (1986); *Hines v. Commissioner*, 90–1 USTC par. 50,028, 65 AFTR 2d 90–488 (3d Cir. 1989), affg. T.C. Memo. 1989–17; *Johnson v. Commissioner*, T.C. Memo. 1992–369; *Erickson v. Commissioner*, T.C. Memo. 1991–97. Since we are not directing our attention to the application of the duty of consistency to sham transactions, we have no need to respond to petitioners' request that we reconcile *Johnson* and *Erickson*, both of which are memorandum opinions and, in any event, are not controlling precedent. See *Darby v. Commissioner*, 97 T.C. 51, 67 (1991).

There is no question the straddle transactions herein fall within the scope of subsection (a)(1) and (2) of section 108 and that, by virtue of the stipulation of the parties, the losses sustained by petitioners in the barred year were not "part of a transaction entered into for profit" within the meaning of the remaining portion of subsection (a). Cf. *Ewing v. Commissioner, supra.* As a consequence, the losses were "not allowable" as a deduction after applying subsection (a) and the transactions fall squarely within the provisions of subsection (c) of section 108. Clearly, if the statute of limitations had not run on the year the losses were deducted, there would be no question but that those losses would be disallowed and petitioners would be entitled under subsection (c) to have those losses, i.e., from the first year, applied against the gains from the straddles realized in the open year, i.e., the second year, in order to determine the net gain or loss reportable by petitioners in the second year. *Ewing v. Commissioner*, 91 T.C. at 420–421.[8]

The question is whether the fact that the loss year is barred precludes the application of section 108(c) and the netting process provided for therein.[9] Respondent premises her position on a requirement that the losses be "disallowed" and concludes that section 108(c) does not apply because the losses involved herein were in effect allowed because of the running of the statute of limitations. Petitioners focus on the phrase "not allowable" and argue that the losses would have been disallowed in the first year had the statute of limitations not run because they were clearly not allowable after

---

[8] See also *Starr v. Commissioner*, T.C. Memo. 1991–610.

[9] We note that transactions lacking in economic substance and therefore "sham" have been held not to be within the scope of other portions of sec. 108. See, e.g., *Glass v. Commissioner*, 87 T.C. 1087 (1986), affd. sub nom. *Friedman v. Commissioner*, 869 F.2d 785 (4th Cir. 1989) (sec. 108(a)), affd. sub nom. *Killingsworth v. Commissioner*, 864 F.2d 1214 (5th Cir. 1989) (sec. 108(a)), affd. sub nom. *Lee v. Commissioner*, 897 F.2d 915 (8th Cir. 1989) (sec. 108(a)), affd. sub nom. *Keane v. Commissioner*, 865 F.2d 1088 (9th Cir. 1989) (sec. 108(a)), affd. sub nom. *Bohrer v. Commissioner*, 945 F.2d 344 (10th Cir. 1991) (sec. 108(a)), affd. sub nom. *Kirchman v. Commissioner*, 862 F.2d 1486 (11th Cir. 1989) (sec. 108(a)); *DeMartino v. Commissioner*, 862 F.2d 400 (2d Cir. 1988), affg. T.C. Memo. 1986–263 (sec. 108(b)); *Gardner v. Commissioner*, 954 F.2d 836 (2d Cir. 1992), affg. per curiam *Fox v. Commissioner*, T.C. Memo. 1988–570 (sec. 108(b)); *Cook v. Commissioner*, 90 T.C. 975 (1988), affd. 941 F.2d 734 (9th Cir. 1991) (sec. 108(b)); contra *Horn v. Commissioner*, 968 F.2d 1229 (D.C. Cir. 1992), revg. and remanding *Fox v. Commissioner*, T.C. Memo. 1988–570 (sec. 108(b)); see also *Yosha v. Commissioner*, 861 F.2d 494 (7th Cir. 1988), affg. *Glass v. Commissioner*, 87 T.C. 1087 (1986) (sec. 108); cf. *Dewees v. Commissioner*, 870 F.2d 21 (1st Cir. 1989), affg. *Glass v. Commissioner*, 87 T.C. 1087 (1976) (sec. 108(a)).

the application of subsection (a). Petitioners therefore conclude that they are entitled to the benefit of section 108(c).

We have very recently had occasion to deal with the distinction between "allowed" and "allowable". In *Lenz v. Commissioner*, 101 T.C. 260 (1993), we were called upon to interpret the phrase "not allowable as a deduction", used in the definition of "disallowed investment interest" which could be carried over to a subsequent taxable year pursuant to section 163(d). Despite the fact that interest in excess of taxable income could not have been carried over prior to the enactment of section 163(d) and despite the fact that the enactment of section 163(d) had, as its principal purpose, limiting the amount of interest that would otherwise have been deductible (assuming sufficient other taxable income), we held, in a Court-reviewed opinion, that the phrase "not allowable" meant what it said and could not be equated with "not allowed" as respondent had argued. We so concluded even though there was some indication of a contrary intention in the legislative history, a situation which does not exist herein (see *infra* pp. 330–331). See also *Day v. Heckler*, 735 F.2d 779, 784 (4th Cir. 1984), where the Court of Appeals carefully distinguished the phrase "allowable deduction" from the phrase "allowed deduction".

If the application of section 108(c) were controlled solely by the phrase "not allowable as a deduction", *Lenz v. Commissioner, supra*, would strongly support the adoption of petitioners' position. However, we must consider the impact of the latter part of subsection (c), which provides that the loss be allowed "to the extent required *to accurately reflect the taxpayer's net gain or loss*" (emphasis added). The question is whether this limitation operates to preclude offsetting gains by the amount of the losses which have already been deducted and allowed because a deficiency would be barred by the statute of limitations.

It is arguable that a literal reading of the statutory language requires the conclusion that Congress has decreed that, once a loss is not allowable under section 108(a), the determination of net gain or loss should be made without regard to whether that loss has, in fact, been allowed. But, it is equally arguable that Congress intended that, in order "to accurately reflect the taxpayer's net gain or loss", the fact

that the loss has been allowed for tax purposes should be taken into account.

We think that the language of section 108(c) is sufficiently ambiguous to permit interpretative analysis in order to give effect to legislative intent and policy objectives of section 108 as a whole. See *Helvering v. Stockholm Enskilda Bank*, 293 U.S. 84, 93–94 (1934); *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 542 (1992). We approach our task recognizing that we do not have the benefit of any direct legislative history in respect of the issue involved herein. Section 108 was inserted in conference and the conference committee report fails to throw any light on the subject. See H. Rept. 98–861 (1984), 1984–3 C.B. (Vol. 2) 1, 170–171. However, the lack of legislative history merely accentuates the challenge; it does not justify a failure of response. As was stated by Lord Justice Denning in *Seaford Court Estates Ltd. v. Asher*, [1949] 2 K.B. 481, 499:

> It would certainly save the judges trouble if Acts of Parliament were drafted with divine prescience and perfect clarity. In the absence of it, when a defect appears, a judge cannot simply fold his hands and blame the draftsman. He must set to work on the constructive task of finding the intention of Parliament * * *. Put into homely metaphor it is this: A judge should ask himself the question: If the makers of the Act had themselves come across this ruck in the texture of it, how would they have straightened it out? He must then do as they would have done. A judge must not alter the material of which it is woven, but he can and should iron out the creases.

Section 108 had, as its principal purpose, rejection of the position respondent was taking at the time of its enactment, namely, that a straddle loss could not be deducted until there was a closed and completed transaction; i.e., the long leg was closed and the net amount realized by the taxpayer was determined—a position that this Court rejected in *Smith v. Commissioner*, 78 T.C. 350 (1972), but which respondent continued to take. See H. Rept. 98–861, *supra*; see also Barrella, "The Deductibility of Pre-ERTA Straddle Losses—the Impact of Section 108 of the Tax Reform Act of 1984," 63 Taxes 116, 118, 123 (Feb. 1985). By enacting section 108, Congress made clear that a pre-ERTA (Economic Recovery Tax Act of 1981, Pub. L. 97–34, 95 Stat. 172) loss was deductible in the year in which the short leg of a straddle was closed provided it was incurred in a trade or business or

in a transaction entered into for profit. See sec. 108(a). At the same time, Congress provided, in section 108(c), that a taxpayer, who could not obtain the benefit of such a loss under section 108(a), was nevertheless entitled to use the loss to offset the gain on the closing of the long leg of the straddle. Thus, Congress designed section 108 as a relief measure to assure taxpayers that only the net economic result would be taken into account so that respondent could not obtain a windfall by denying the losses and then taxing the gains, resulting from the closing of the straddle.

There is not the slightest indication that Congress intended the provisions of section 108 to provide not only relief but a windfall to taxpayers who engaged in pre-ERTA straddle transactions.[10] To permit such a result herein would contravene the principle that "the Code should not be interpreted to allow * * * [the taxpayer] 'the practical equivalent of double deduction' * * * absent a clear declaration of intent by Congress". See *United States v. Skelly Oil Co.*, 394 U.S. 678, 684 (1969) (quoting *Charles Ilfeld Co. v. Hernandez*, 292 U.S. 62, 68 (1934)); see also *Ambac Industries, Inc. v. Commissioner*, 487 F.2d 463, 467 (2d Cir. 1973), affg. 59 T.C. 670 (1973); *Rome I, Ltd. v. Commissioner*, 96 T.C. 697, 704–705 (1991).

Losses incurred in a trade or business or in a transaction entered into for profit are "allowed as a deduction" under section 165. Petitioners assert, in their argument in respect of the "duty of consistency", that the loss on the disposition of the short leg of a straddle is a separate transaction from the gain on the disposition of the long leg of a straddle, citing *Smith v. Commissioner, supra*. We think it clear that our approach in that case was confined to determining the proper timing of the deduction for a straddle loss and was not intended to decree an absolute separation, for all purposes, of the gain and loss aspects of a straddle transaction. In the instant case, a different situation exists, namely, the *right* to "the practical equivalent" of a deduction by way of an offset of straddle losses deducted in a year now barred against straddle gains in the years before the Court.

Moreover, it is clear that a complete identity is not required between the transaction in the earlier year and that

---

[10] Post-ERTA straddle transactions are governed by sec. 1092.

of the later year. Cf. *United States v. Skelly Oil Co., supra,* where the Supreme Court required the taxpayer to reduce the deduction in a later year of refunds of overcharges of customers in earlier years by the amount of the depletion deduction which it had taken in respect of such charges in the earlier years. We also note that it has been suggested that the double deduction rule applies only where the action in the barred year was correct and does not apply where such action was erroneous, as is the case herein. See *B.C. Cook & Sons, Inc. v. Commissioner,* 59 T.C. 516, 521–522 (1972), a decision whose precedential value is open to question; see *B.C. Cook & Sons, Inc. v. Commissioner,* 65 T.C. 422, 432 (1975) (Dawson, *J.,* concurring), and the opinion of the Court of Appeals affirming this decision per curiam 584 F.2d 53 (5th Cir. 1978). We are satisfied that whatever continued vitality this limitation on the application of the double deduction rule may have, it does not extend to restricting our use of such rule as an aid to determining legislative intent, particularly in respect of a statutory provision specifically dealing with the type of transaction involved. Indeed, this is precisely what the Supreme Court did in *United States v. Skelly Oil Co., supra,* in interpreting section 1341. Nor do we consider ourselves precluded from pursuing this path by the fact that the double deduction rule was not asserted by respondent, since it has long been established that "we can rest our decision for respondent on reasons neither set forth in the notice of deficiency nor relied upon by respondent." *Ware v. Commissioner,* 92 T.C. 1267, 1269 (1989); *Smith v. Commissioner,* 56 T.C. 263, 291 n. 17 (1971).

We conclude that to permit an offset of losses from the barred year against gains in the open year before us would in effect constitute a double deduction and would not "accurately reflect" the net gains and losses from the straddle transaction under section 108(c).

We are still left with the question whether, despite our conclusion as to the application of section 108(c), petitioners should prevail because of an alleged inconsistency in respondent's treatment of straddle gains and losses in the years before us. In her notices of deficiency, respondent determined that the transactions involved herein lacked economic substance, i.e., were substantive shams, and proceeded to eliminate all straddle gains and losses in those years

except the amount of such gains which equaled such losses and which had been deducted in the barred year. However, the "sham" treatment has been superseded by the stipulation of the parties that the instant case should be dealt with on the basis that *Fox* type transactions are involved. See *supra* p. 327.

In form, in her deficiency notices, respondent eliminated the straddle losses in the years before us and excluded the straddle gains to the extent that they exceeded the straddle losses in the barred year. Petitioners do not dispute respondent's actions as far as they go, but assert that having given them the benefit of excluding some of the straddle gains, they are entitled, as a matter of consistency, to have all such gains excluded. They contend that consistency demands that respondent should not be able to pick and choose among the straddle gains to be excluded. Whatever the result might be in the context of substantive sham transactions, see *infra* p. 336, we do not have that situation here. Moreover, we are not impressed by petitioners' attempt to exploit the form adopted by respondent in her deficiency notices. The issue before us turns upon substance not form. Whether viewed as an exclusion of gains or an offset of losses against gains, the substance of petitioners' position is that, under the guise of a duty of consistency on the part of respondent, they are entitled to "'the practical equivalent of double deduction'". See *United States v. Skelly Oil Co., supra*. We think petitioners' position should be rejected.

We have previously concluded that the *Fox* type transactions involved herein fall within the ambit of section 108(c) and that a proper interpretation of that section permits respondent to deny petitioners the right to offset straddle losses from a barred year against straddle gains in the open years before the Court; i.e., petitioners are not entitled to exclude such straddle gains in the amount of such losses under section 108(c). Adopting petitioners' position on respondent's duty of consistency would in effect be a holding that respondent was inconsistent in doing precisely what we have decided that section 108(c) permitted her to do. In this connection, we note that in respect of two petitioners herein, respondent apparently excluded a small amount of gain in excess of offsetting losses ($424 out of $25,080 in one case and $78 out of $174,865 in the other case). We are not per-

suaded that such actions provide a foundation for accepting petitioners' position as to respondent's duty of consistency and thereby afford petitioners an advantage to which we have concluded they are not entitled under section 108(c).

In sum, we are not prepared to travel the path urged by petitioners in respect of respondent's duty of consistency because we are satisfied that to do so would defeat the legislative objective of section 108(c), namely, to afford relief to taxpayers who engaged in pre-ERTA straddle transactions by enabling them not to suffer economically by reason of straddle losses which they found themselves unable to deduct despite the taxation of their straddle gains. We emphasize that, as we see it, the disposition of this case turns upon the application of a specific statutory provision. *Commissioner v. Mnookin's Estate*, 184 F.2d 89 (8th Cir. 1950), affg. 12 T.C. 744 (1949), cited by petitioners, is distinguishable in that it dealt with an accounting question under broadly applicable statutory provisions. Nor can petitioners derive any comfort from *Johnson v. Commissioner*, T.C. Memo. 1993–178, which involved how a transaction should be characterized, i.e., giving rise to long-term gain or ordinary income, and not the question presented here. Other cases cited by petitioners, e.g., *Davis v. Commissioner*, 65 T.C. 1014 (1976), *Davis v. Commissioner*, 69 T.C. 716 (1978), and *Vesco v. Commissioner*, T.C. Memo. 1979–374, involve the issue of discrimination among taxpayers where the considerations are entirely different from those present herein.

We hold section 108(c) does not permit petitioners to offset their unallowable losses in earlier years, as to which a deficiency is now barred by the statute of limitations, against their gains in the taxable year before us. In so concluding, we find it unnecessary to examine the extent to which certain elements of a "duty of consistency" on the part of petitioners are present herein, see *supra* note 5, particularly whether petitioners' position rests on an inconsistent or alternative position, [11] whether the deduction involves a misrepresentation of law and/or fact, [12] and whether respondent

---

[11] See, e.g., *Heer-Andres Investment Co. v. Commissioner*, 22 T.C. 385 (1954); *McCulloch Corp. v. Commissioner*, T.C. Memo. 1984–422; see also *Rivers v. Commissioner*, 49 T.C. 663 (1968).

[12] Compare, e.g., *Herrington v. Commissioner*, 854 F.2d 755, 758 (5th Cir. 1988) (whether straddle transactions are "sham", i.e., without economic substance, is at most a mixed question of law and fact) with *Kirchman v. Commissioner*, 862 F.2d 1486, 1490 (11th Cir. 1989), *James*

relied upon the representation in petitioners' returns for the barred year.[13]

Beyond the foregoing, we again emphasize that we leave to another day the disposition of the issue before us where the transactions are "sham" transactions, either substantive in the view of *Glass v. Commissioner, supra* note 9, or factual in the view of *Brown v. Commissioner*, 85 T.C. 968 (1985), affd. sub nom. *Sochin v. Commissioner*, 843 F.2d 351 (9th Cir. 1988). Such disposition will require consideration of whether subsection (c) of section 108 applies to such transactions even though subsections (a) and (b) do not, possible reconsideration of the applicability of subsections (a) and (b) to such transactions in view of the fact that the Courts of Appeals are in conflict on this issue,[14] and consideration of the extent to which the duty of consistency on the part of the taxpayer may be involved together with a critical examination of all the elements of any such duty. Such considerations will need to take into account whether eliminating all gains and losses arising from such transactions, including losses deducted in years barred by the statute of limitations, will produce a situation where full illegitimacy, represented by "sham" transactions, fares better than pseudoillegitimacy, represented by *Fox* type transactions.

Our conclusion herein also makes it unnecessary for us to consider the question whether the tax benefit rule has any application to the situation involved herein, see *Hillsboro Natl. Bank v. Commissioner*, 460 U.S. 370 (1983), a question which was not addressed by the parties and which respondent expressly stated was not involved herein. See also *Unvert v. Commissioner*, 72 T.C. 807 (1979), affd. 656 F.2d 483 (9th Cir. 1981).

---

*v. Commissioner*, 899 F.2d 905, 909 (10th Cir. 1990), affg. 87 T.C. 905 (1986), and *Glass v. Commissioner*, 87 T.C. 1087, 1172 (1986) (whether straddle transactions are "sham", i.e., without economic substance, is a question of law).

[13] *Erickson v. Commissioner*, T.C. Memo. 1991–97; *Gmelin v. Commissioner*, T.C. Memo. 1988–338, affd. without published opinion 891 F.2d 280 (3d Cir. 1989).

[14] Compare *Horn v. Commissioner*, 968 F.2d 1229 (D.C. Cir. 1992), revg. and remanding *Fox v. Commissioner*, T.C. Memo. 1988–570, with cases cited *supra* note 9; see also *Dewees v. Commissioner*, 870 F.2d 21 (1st Cir. 1989), affg. *Glass v. Commissioner*, 87 T.C. 1087 (1986).

In order to take into account the settlement of other issues between the parties,

*Decisions will be entered under Rule 155.*

---

APPENDIX

Frederick A. and Martha G. Alling, Steven Corsun, Keff I. and Ruth Dank, Irving and Ilene Fish, Stephen J. and Nancy P. Friedman, Murray L. and Dorothy E. Goldberg, Jack and Ruth Guggenheim, Robert Herzog, Lawrence and Carmela Italiano, Howard and Wilma Kaye, Robert J. and Lauren R. Kleeblatt, Gerald and Joan Litzky, Sami Mayyasi, Philip and Florence Mittleman, Emanuel and Helen A. Savas, Arnold and Miriam Schuman, Lawrence I. and Sara C. Schweid, Marc N. and Gloria E. Silverman, Raymond J. and Joy E. Tennison, Estate of William Van Looy, deceased, Priscilla Van Looy, executrix, Priscilla Van Looy, Milton and Blanche Wasserberger, Joel and Judith Weinstein, docket No. 6197–84; Richard and Elaine Berman, Edgar G. and Arlene F. Braunstein, Ronald and Ester Breslow, Howard and Nancy Brown, Estate of Jerome Casser, deceased, Barry Casser, executor, Estate of Charlotte Casser, deceased, Barry Casser, executor, Peter B. Cinelli, Sanford and Ethel Dorf, Jan and Annelien Doornbosch, Erwin and Christine Eibert, Barry and Pamela Fingerhut, Irwin and Nora Friedman, Max and Ellen Halbrecht, Robert Herzog, Dennis and Diane M. Howie, Ernest and Rose Wachtel, Herbert V. and Iris Karp, Mitchell and Edith Konner, Larry and Barbara Kopp, George J. and Lillian Liebner, Jack and Anneliese Lindner, C. Stuart and Phyllis Littwin, Jack and Evelyn Melnick, Robert and Frances Nelson, Frank and Nancy Sciara, Leo and Eleanor Zucker, Jonathan and Linda Zurit, Neal H. and Barbara Bettigole, Howard and Claire Spanbock, Estate of Marvin Kopp, deceased, Judith Kopp, executrix and Judith Kopp, docket No. 15748–84; Robert Borra, Michael A. and Sandra Farina, Joseph and Alda Casser, Irving and Ilene Fish, Arthur and Dorothy Greenbaum, Robert and Theodora Greenbaum, Paul Rowe, Michael and Jane Silberfein, Wendell A. and Joan N. Smith, Gerald and Susan Wolff, Martin and Gladys T. Roth, docket No. 29586–84; Roy and

Antoinette Chapman, docket No. 31737–84; Rony and Ellen Kessler, Abraham and Naomi Mizrachi, Max and Janet Zweibel, docket No. 37132–84; Estate of Joel Spector, deceased, Barbara Spector, executrix and Barbara Spector, Abraham and Annette Badian, Max and Janet Zweibel, Jack F. and Sylvia D. Kramer, Theodore and Patricia O'Lear, Conrad K. Sterrett, and Leonard and Esther Lowery, docket No. 5676–85; Harold T. Eisenman, Aldo and Lucy Genova, Sheila and Marton Grossman, Catherine K. Hardwick, Donn and Rosemarie Sand, Frank and Nancy Sciara, Donald and Marguerite Toresco, Harold and Donna Traub, docket No. 29996–85; Estate of Mary L. Burkholder, deceased, Guy S. Burkholder, II, executor, and John J. Burkholder, Jr., executor, Estate of Stanley Danzig, deceased, Sylvia Danzig, executrix, and Sylvia Danzig, surviving spouse, Nancy A. King, Jack and Anneliese Lindner, James and Rita Murphy, docket No. 41809–85; Charles and Hana Diamond, docket No. 39519–86; Richard and Laurie Allison, Ubaldo and Nellie Gonzalez, Billy and Doris Hellems, Peter and Phyllis Honig, John and Marian Wanner, Julian and Alice Avrutick, docket No. 45975–86; Benjamin and Judith Handelman, docket No. 29527–87; Beno and Lisa Sternlicht, docket No. 27523–88; Herbert and Irene Freiman, docket No. 5214–89; Gerald D. Vogel, docket No. 22733–90.